UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED
JUN 3 0 2005
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA : | CRIMINAL NO. 05-248-JR |
| v. : | VIOLATIONS: 21 U.S.C. §846 |
| : | (Conspiracy to Distribute and Possess With Intent |
| JAVIER DIAZ, : | to Distribute More than 5 Kilograms of Cocaine |
| a.k.a. "Perucho," : | and More than 50 Grams of Crack Cocaine Base) |
| : | |
| Defendant. : | (UNDER SEAL) |

GOVERNMENT'S PROFFER OF EVIDENCE

1.  From at least 2001 and continuing to and including January 2005, the defendant, Javier Diaz, aka "Perucho," was associated in fact with and did knowingly and willfully combine, conspire, confederate and agree together and with persons both known and unknown to the United States, including Sergio Orellana (also known as "Checho," "Punpillo" and "Johnny") to unlawfully, knowingly and intentionally distribute and possess with intent to distribute cocaine and cocaine base in the form known as crack. The narcotics trafficking conspiracy in which defendant Javier Diaz, aka "Perucho," was associated took place in Washington, D.C., Maryland, and elsewhere.

2.  During his participation in the above-described conspiracy, defendant Diaz engaged in a pattern of activity by knowingly and willfully committing, or knowingly and willfully aiding and abetting the commission of, the distribution of, and the possession with the intent to distribute, cocaine and cocaine base in the form known as crack.

3.  During his participation in the above-described conspiracy, defendant Diaz knowingly and intentionally conspired and agreed with a number of individuals, both known and unknown to the government, including Sergio Orellana to distribute and possess with intent to distribute a mixture and substance containing more than 150 grams but less than 500 grams of cocaine base in the form known as crack, and more than 15 kilograms but less than 50 kilograms of cocaine which amounts include amounts distributed or possessed with intent to distribute by defendant's co-conspirators pursuant to jointly undertaken criminal activity that was reasonably foreseeable by the defendant and within the scope of the defendant's conspiratorial agreement. During his early participation in the conspiracy, defendant Diaz received cocaine in gram quantities from Sergio Orellana for the purpose of reselling the cocaine to others. Eventually, and on at least 4 separate occasions, defendant Diaz acquired larger quantities of cocaine and cocaine base, in the form known as crack, directly from Sergio Orellana for purposes redistributing these quantities to others. Diaz also arranged, on behalf of Orellana, a sale of fifteen kilograms of powdered cocaine. These narcotics transactions, which were with cooperating witnesses and an undercover agent, transpired as follows.

4. During the period April, 2004 to July, 2004, at the direction of the FBI, a cooperating witness (CW #1) facilitated the introduction of three "customers" to Diaz. These customers were in reality an FBI Undercover Agent (UCA), and two Cooperating Witnesses (CW #2 and CW #3). On May 4, 2004, at the direction of the FBI, CW#1 arranged for Diaz to meet a potential cocaine customer, who, is in fact, CW #2. The purpose of the meeting, which occurred in Washington, D.C., was for CW#2 to discuss a future cocaine transaction with Diaz and determine Diaz's capacity to provide kilogram quantities of cocaine on a regular basis. During this meeting, Diaz contacted Orellana in order to receive authorization to sell CW #2 cocaine. After concluding the telephone call, Diaz advised CW #2 that his "boss" had authorized him to sell CW #2 an initial 250 grams of cocaine for a price of $4500. Diaz explained that if this initial transaction occurred without incident, "they" would be in a position to provide CW #2 with fifteen kilograms of cocaine at a time. Diaz also indicated he and his boss were selling kilogram quantities of cocaine hydrochloride and cocaine base at between $18,000 and $25,000 per kilogram, depending upon the quality. As a sample of his and Orellana's product, Diaz provided CW#1 a package containing approximately 4.4 grams of a substance which the DEA Mid-Atlantic Laboratory determined was cocaine hydrochloride with a purity level of 41 %.

On May 6, 2004, CW #1 and Diaz met to discuss the sale of the initial 125 grams of powdered cocaine and 125 grams of crack cocaine base to CW #1's customers. Diaz told CW #1 that he wanted clean money for this sale. Diaz also told CW #1 that CW #1 should receive a commission of $1,500 for this "small" transaction and at least $1,000 per kilogram for each of the fifteen kilograms of powdered cocaine that they were arranging to sell to the customers. During this meeting, CW #1 paid $100 to Diaz for the sample of cocaine Diaz provided to CW #1 on May 4, 2004.

On May 18, 2004, CW #1 conducted a controlled purchase of approximately 250 grams of cocaine hydrochloride from Diaz for approximately $5400. CW#1, equipped with a recording and transmitting device, transported Diaz to and from the transaction. During these conversations, Diaz received instruction from Orellana on how to conduct the drug transaction and where Diaz should meet him to pick up the drugs. Orellana insisted that Diaz have the money for the drugs in his possession before Orellana would give him the cocaine for CW #2. CW #2 provided Diaz with $5400 in pre-recorded funds for the purchase. Diaz indicated to CW#2 that he would return in approximately fifteen minutes with the cocaine. Diaz went and obtained the drugs from Orellana, who was in his car at a location in Maryland. When Diaz returned, he gave CW#1 approximately 250 grams of cocaine hydrochloride. A forensic chemist at the DEA Mid-Atlantic Laboratory determined that the cocaine hydrochloride weighed 246.4 grams with a purity level of 36 %.

On June 7, 2004, CW #1, equipped with a recording and transmitting device, picked up Diaz at his residence and drove him to meet with a FBI UCA, who was represented as another potential drug customer. At a pre-determined location in Washington, D.C., Diaz provided the UCA approximately 250 grams of cocaine base, in the form known as crack, in exchange for $6,950 in pre-recorded funds. During the recorded conversation, and prior to meeting with the UCA, Diaz informed CW#1 that Orellana was more concerned with selling a quality product, and keeping his

customers happy. A forensic chemist at the DEA Mid-Atlantic Laboratory determined that the cocaine base, in the form known as crack, weighed 247 grams with a purity level of 50 %.

On July 20, 2004, in a meeting arranged by CW #1, Diaz provided approximately 115 grams of cocaine base, in the form known as crack, to a third Cooperating Witness (CW #3) in exchange for $3,500. CW #1 drove Diaz to and from the meeting location. During the recorded conversation, CW #1 asked Diaz if Orellana was going to be around for this deal. Diaz advised that Johnny (Orellana) was out collecting money. Diaz indicated that Orellana was still receiving a lot of "merchandise" and had a lot of cocaine on hand. A forensic chemist at the DEA Mid-Atlantic Laboratory determined that the cocaine base, in the form known as crack, weighed 114.7 grams with a purity level of 49 %.

5. The foregoing proffer of evidence is not intended to be an exhaustive statement of all facts known by the defendant relating to each incident or as to other matters relevant to the above-described enterprise. The foregoing proffer of evidence is only a limited statement of facts necessary to support the defendant's plea of guilty.

Respectfully submitted,

KENNETH L. WAINSTEIN
United States Attorney

*[signature]*

GEORGE P. ELIOPOULOS
Assistant United States Attorney
Organized Crime & Narcotics Trafficking Section
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-7294

## DEFENDANT'S ACCEPTANCE

I have read the Government's Proffer of Evidence setting forth the facts as to my participation in a conspiracy to distribute and possess with intent to distribute cocaine and cocaine base, in the form known as crack, in violation of Title 21, United States Code, Section 846. I have discussed this proffer fully with my attorney, H. Heather Shaner, Esquire. I fully understand this proffer and I acknowledge its truthfulness, agree to it and accept it without reservation. I do this voluntarily and

of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this proffer fully.

Date: 6-30-05

_____
JAVIER DIAZ
A.K.A. PERUCHO
Defendant

### ATTORNEY'S ACKNOWLEDGMENT

I have read the government's proffer of evidence as to my client's participation in a narcotics conspiracy. I have reviewed the entire proffer with my client and have discussed it with him fully. I concur in my client's agreement with and acceptance of this proffer.

Date: 6-30-05

_____
H. HEATHER SHANER, Esquire
Counsel for Javier Diaz

4